Good morning, Your Honors. Todd Burns on behalf of the House of Representatives. Yes, Mr. Burns. Good morning. I want to begin by discussing some of the sentencing issues raised in this case. There is no doubt that Mr. McGill committed a horrible crime. There's also no doubt that in the 57 years leading up to that crime, he showed himself to be a good person and even a loving husband. And I think that was best established by a short video that I submitted during the sentencing proceedings, which had remarks from his kids, his colleagues, former students, and friends. I think they make that point far better than I could with my words. And I've included that with the extricate record. And if any of Your Honors haven't had a chance to review that, I would beg that you look at it, because I think it's powerful stuff. And it not only makes the case for the weight that should have been given to his history and characteristics, but it also makes the case for the fact that except for the fact that Mr. McGill was insanely drunk, this is a crime that he never would have committed. And given that and some of the other circumstances in this case, the obvious lack of a plan, no premeditation, no attempt to evade detection that he essentially confessed right after the fact, I and my co-counsel, who my co-counsel has a great deal of experience in federal capital and federal homicide cases, were stunned at the outset of this case when the government was going down this path of first-degree murder charge and unwilling to discuss settlement. And — Let's assume everything you say is true. Let's assume that you were stunned. It seems like a long sentence. By what standard do we review the judge's decision to impose this sentence? Well, you know, I've raised several issues regarding — There doesn't seem to be any — let me just stop for a second. I don't think you're contending there's any procedural error in this case. I am not. He heard all your arguments and rejected them and decided to, because of the brutal nature of the murder, as I read the record, which seems to be pretty uncontested — to impose this higher sentence, this life sentence. By what standard do you view the judge's decision to do that? Well, I am alleging procedural error here, and I think it comes back to an abuse of discretion. The procedural error issue, though, is effectively the main one that I'm attempting to focus in on here. It's really a question of law, so I think even if you were to give some discretion to that, that it's effectively de novo review. But the procedural error — What's procedural error? Are you talking about the erroneous facts? Are you talking about inadequate explanation? What are you talking about? Well, I've raised all of those, but — I mean, to me, we've got some stuff that might be procedural error. I'm still trying to figure out what you're telling me about the procedural error. What issue are you focusing on? And what my sort of preliminary remarks were meant to focus in on is that the government's position was influenced strongly by these opinions of the medical examiner, Dr. Wagner. We challenged those in the Lemonade proceeding. They were all excluded as medically baseless. The government came back to those exact same opinions on sentencing and said, look, this was a very — this defense was committed in a very cruel manner and relied on these exact same opinions. We, again, challenged those and said, look, you've already excluded these as medically baseless. They're contrary — That was the purpose of the trial, though, wasn't it? Well, we didn't have a trial. Well, it was anticipated you were going to have a trial, right? Well, and given what happened, you know, sometimes a defense lawyer says maybe it's better to try this case completely guilty because the facts will get erred more clearly than they might in a sentencing proceeding. And I think — Well, the judge could have conducted a full-blown evidentiary hearing if she had wanted to. And she didn't. What she said is — Right. I'm not going to resolve these fact disputes because they're not going to matter. But then if you look at her findings for varying, she's coming back to exactly the government's position. The three ones that she — that she cites are Dr. Wagner's — you know, his original opinion is the panties are torn. There must have been an attempted sexual assault. Well, she relies on that the panties are torn, which we, you know, dispute, but we certainly dispute that he had any intent in tearing the panties, even if they were. Therefore, he left her in a humiliating manner. The facts don't support that. And that's a fact that she was unwilling — the judge was unwilling to resolve, but that affects what it comes to, to rely on imposing the sentence. Well, but when — as I read — as I read her statement, she says — I don't think she resolves whether or not there was a sexual assault. She says, as a matter of fact, here are all the facts that I know, none of which are disputed. You have a picture of — you have these pictures of a woman who was clearly brutally beaten to death. And I don't think you ever contested that below. And her panties are torn. They are torn in the pictures. It's not clear why they're torn. And she recites all these facts and says, this is such a brutal murder that I want to — I'm going to depart upwards, if you will. Why — what's wrong with that? Tell me what's wrong with that. Well, again, I think there are a number of things, but what I'm focusing on right now is she doesn't resolve the question of, well, you know, is there evidence as to when these panties were torn, if there's any sort of negative intent that you can construe from that. But yet she relies on that imposing sentence. Same thing with the length of the beating. You know, she won't resolve that issue, but then she says, well, the beating was prolonged. And I don't think you can say, well, I'm not going to resolve any of these fact issues and then essentially rely on the government's side of things, because then this Court doesn't get the same. Why can't — why can't — for purposes of sentencing, why couldn't she take a look at the pictures? Oh, I think she can. Take a look at the pictures and look at — look at the — all the bruising and the condition of the body and say, well, you know, this just didn't happen in five seconds. Well, but the medical expert — I mean, she used the term prolonged, but I don't know if she used the term prolonged or not. But whatever term she used, I mean, she did — it's pretty clear that she was fully aware of the condition of the body when it was discovered. She used the term prolonged. We did have experts, pathologists, you know, opining as to the length of time. Originally, their expert had said 15 minutes. He would have had to rest. There's no medical basis for that. She precluded that as trial evidence, but then found it was prolonged after being unwilling to make any sort of finding in the sentencing proceeding. The same thing with, well, she must have suffered for, you know, a significant period of time before she passed away. It could have been a minute or two. And my point on those things is that if you're talking about a frenzied beating that takes a minute and a person dies within a minute. And I think you're right. I mean, the question is, what is the maximum possible sentence here with life, correct? So what — I don't quite understand. The guy — are you complaining about the guideline sentence that she — in calculating the guidelines, or are you going from the guideline sentence to life? I am to the extent that she didn't give the additional point for acceptance. But the big issue here is, because she relied on departure and Mohammed and Ellis say, you know, we don't — the court doesn't assess departures. Instead, you look at, was there an adequate reason for the variance? And the reason she gave for the variance here are things that you would expect to be involved in any second-degree murder case. A second-degree murder case is likely going to be committed by hand, in a moment of passion, oftentimes while drunk, and usually the person won't die immediately when they're beaten by hand. So these are all factors that are inherent in a second-degree murder case. And under Gong and Kimbrough, she needed to give compelling reasons to vary, and those aren't compelling reasons. And plus, of course, they're based on taking the government side and factual disputes that the court wasn't willing to resolve. And I think it's important to emphasize the variance here was to the statutory maximum, was effectively double the — more than double the high end of the guideline range involved here, and was two times the national average for all murders, first and second degrees. So this is a substantial variance that needs to have very strong reasons to support it. And the reasons that are given to support it are, again, taking the government's side and disputes that the court would not resolve. And if she had resolved it, then this Court could say, well, did she get that right or wrong under clear air? But instead, she didn't resolve it, and yet relied on those facts essentially to vary upward dramatically. So your — the procedure you're claiming about is that she didn't make findings? Well, first of all, she didn't make findings. Mm-hmm. Secondly, even if you were to sort of credit the reasons that she gave, which I don't think you could because she didn't make the findings as a preliminary matter, those reasons are not significant enough to support it. To what extent does the district court actually have to make findings of fact as opposed to give a reason? Well, Rule 32 says if there are disputed issues, the court either has to make the findings or say this isn't going to affect my decision. The court declined those findings and said this is — So let me try this again and see if this is disputed. I don't think there's any dispute that the victim was beaten to death. Correct? That's correct. And I don't dispute that it was a — it was a brutal beating. Okay. Okay. The victim was brutally beaten to death. Can the judge, on the basis of that, by someone who she trusted and was married to? Can the judge vary upwards to the degree that she did just based on that? Yes. I don't believe that she can because I think that those factors are, again, factors that you're going to find in the, you know, routine or typical second-degree murder case. It's a murder that's usually committed while drunk, in a frenzy, by hand, because if he Then you're talking premeditation. Then you're talking first-degree murder. First-degree murder may be a lot more, you know, clean. I don't mean to be flippant, but really that's the blunt way to put it. But it's premeditated, and it's worse, and it's punished worse. Well, are you arguing that based on these pictures, and I suspect also based on your failure to dispute, that one is left victim, bloodied, bruised, partially clothed on the bathroom floor, even with a brutal beating, heinous breeding, degrading, that that is not a basis to part upward? Well, I say heinous and degrading are loaded words. I'm trying to be, you know, use more objective words that Well, I guess you can say they're objective, but I was trying to say what it is that I think one can depart for. And I was looking at if she gives, if I only have the evidence that you don't dispute, is that not enough? That's what I'm looking at here. I don't think it is when you, especially when you look at the guidelines that are arranged here and are based on empirical evidence as to what's done in this country. And if you're going to deviate so substantially from those guidelines, you can't be relying on factors that are inherent in any second-degree murder case, which is going to be a beating by hand. Well, I guess you know more about any second-degree murder case than I do. When I looked at what there is here and what you admitted to, it didn't seem to me that that was the normal second-degree murder. I think one of the I had a few in Idaho. I mean, I'm not sure about it. I think one of the handicaps in the Federal system is we don't see these things as often. I know Judge Hurwitz was, of course, on the Arizona Supreme Court and probably has seen a lot more of these. I'm not as familiar with what your background on that would be. But I don't think that there's really any disputing the basics that a second-degree murder, what routinely separates it is a lack of a weapon, so a beating by hand, and someone who's extremely hostile. Could the Court rely on the autopsy report? Well, I would say that she did to the extent she relied on disputed findings without making those fact findings that were called for. So you're suggesting she shouldn't have but did? I'm suggesting she shouldn't have relied on, not necessarily the autopsy report, but the government's expert discovery with respect to murder. Well, I'm not talking about the government's expert discovery. I'm talking about evidence in the record that she had that you don't dispute, and yet there's evidence in the record, it seemed to me, that you don't dispute some things. Then she had in the record an autopsy report. She had in the record pictures of the body. She, in fact, in one photograph, it seems she was left without underwear. She obviously, I don't dispute that she can rely on facts that have been deduced and not disputed in sentencing. Mr. Berger, would you like to save the remaining two minutes? I would like to briefly just say on the issues with respect to the guilty plea, the vacating the guilty plea, the government has not disputed the structural error claims at all. I don't understand why that's structural error. What I understand your argument is, is that when the defendant appeared for a change of plea, the clerk asked the defendant, how do you plea? That's correct. Without advice. And then the judge went through the colloquy. And then, unfortunately, she overlooked a few, the rule 32 admonitions or whatever, advisements and whatnot. She overlooked two Boykin constitutional rules. Right. Right. But they're also embedded in the rules. Why? I mean, I did that. I must have proceeded that way I don't know how many times. Nobody ever suggested that that was structural error. I think in the Southern District of California, it's not uncommon, well, it's contrary to what the bench book recommends. It's not uncommon. Who cares what the bench book? I mean, the bench book is just nothing but a set of guides. It's not uncommon for a judge to say, you know, at the beginning, do you plead guilty to this offense? The person says yes. Then the judge advises them of everything that's necessary to advance the case. The judge then does not automatically accept the defendant's plea. Now, what they always do afterwards is say, now, again, having been advised, how do you plead? They have them plead again. Because you have to advise them before they plead. So, really, you know, you shouldn't, arguably, shouldn't be taking the guilty plea at the beginning, regardless, without having advised them, at least of the Boykin constitutional rights. Well, the Rule 11, Rule 11 says you give the colloquy before accepting the plea. Correct? Well, that's the government's argument that accepting. No, I'm kidding. What does Rule 11 say? It says before accepting. The question is what accepting means. Well, the judge said, in this case, the judge said she gave an inadequate, perhaps, Rule 11 colloquy, leaving a couple things out, whether or not that's error is a separate issue. But the judge then says, given you've answered all these questions, I now think you're voluntarily giving up your rights, and I accept your plea. What's procedurally wrong with that? Well, I think Gastelum makes clear that you can't read accepting in the way that the government's position is here, that accepting means, actually, when the government takes the plea for the person, not when the judge says or, I'm sorry, when the judge takes the plea for the person, not when the judge says, now, I accept your plea. But even setting that aside, the constitutional errors here, Boykin makes clear that just when a person gets up and says, I'm guilty, just by doing that, they're waiving three important rights, the right to trial, the right to confrontation, and I feel like Governor Perry now, the third one's eluding me. But these three rights, just by pleading guilty, you're giving up. So you have to be advised of those before you give them up. And so what the district court judge did here, in taking the plea before advising Mr. McGill of anything, clearly violates Boykin. And then, of course, we have the two specific rights, which is the confrontation right and the right to trial and the aspects of the right to trial that have been held to be fundamental since Boykin. Those are constitutional errors that Dominguez Benitez, the Supreme Court's case, makes clear are structural errors that the failure to advise on requires reversal. Okay. Thank you, Mr. Chairman. May it please the Court, I respond to your question. Keep your voice up. The judge here did not abuse discretion in finding a substantively reasonable judgment. The court clearly said that the parties are sent, I'm not going to rely on them. And she didn't. She didn't get into whether underwear are torn. She said, I'm looking at the humiliating way this woman was left. She didn't get into the dispute of how many minutes. She didn't want to get into that numbers game. She said, I don't care if it's two or three minutes or 10 or 15. It's a prolonged beating. She's looking at the nature of the crime. That's what she does. It's not enough to just look at bare statistics that tell us nothing about the crime. Treadwell tells us each crime has to be judged on its own. Each defendant and each crime has to be looked at individually. That's what the judge did here. The judge had more than sufficient evidence upon which to make any findings. Certainly any findings she did make are not without foundation. That's what this court would have to find. She did look at other cases. She did consider the mitigating factors. She pointed out several times the good life that this person had led. But then she said, but I find that the aggravating factors substantially outweigh the mitigating factors. She made that determination. Respond to counsel's argument that with that which is in the record and for which she makes no finding, that it is not enough really to upward depart. I think there's more than enough to upward depart. This was a man who we know from the facts of the beating. This wasn't just totally outraged and not a thinking process. The bathroom door had to be opened and closed from the outside. We know that the dispute began in the cabin. It had to be moved in and there had to be a conscious, not just moved in and out of going crazy. It actually had to reach and close that door. How do we know that? Because there's blood spatter all over. Plus it was the brutality of the beating. She had the autopsy report. It's a broken nose, a broken cheek, a broken orbital bone. There's strangulation. There's stomping on the body. I would encourage the court to look at those pictures again. There can't be any dispute about whether underwear was torn. Look at pages 412 and 413 of the S.E.R. You can see that there's a footprint right here. That footprint wouldn't be there if her underwear were there. Plus the testimony of the person who said, I remember covering her genitals. But be that as it may, the court can rely on the savagery of the beating, on the fact that this was this man's wife watching the person she loved beat her, strangle her, stand over top of her and stomp on her to the tune of breaking ten ribs. She had cerebral bleeding. She had abdominal bleeding. This was an extremely severe, severe beating. Then he doesn't then go for help or do anything. He actually makes some very conscious decisions. He leaves the key. First of all, he sees his buddy. He cleans up. He changes clothes. But then he packs a bag and leaves the key so nobody can get in and goes up on board. Very suggestive of a baby. And then he sits up there and drinks with his buddies and even poses for a picture with his thumbs up. That whole picture, that's what the judge saw. The judge saw it from the beginning to the end and saw that whole picture and said, this is not some typical case. Yes, I consider the mitigating factors, but I consider the aggravating factors. And she reached that sentence. And she did it under a departure. She didn't just come up with it. She said, I look at 5K2.8. Is it heinous, brutal, and degrading? She said yes. And I can't imagine anything more heinous and brutal than this beating by her husband and degrading in the way she was left to die. And, by the way, it's undisputed by even their expert that there's aspirated blood. She was left dying for struggling for her life on that floor. Can I ask you, I want to return to the plea colloquy issue. And let me just run through a couple of things with you. First, there was a plea agreement here. Yes, there was. Which listed rights that were being waived by entering into the plea. Yes. And then the clerk takes the plea and the judge advises of some of the rights that Mr. McGill is giving up by pleading guilty, but not all of them. Not the entire Rule 11 list of rights. Correct. I'm frustrated because we've got a couple of these on this calendar, not today necessarily. Doesn't a U.S. attorney stand there with a copy of Rule 11 and say to the judge, oops, judge, you're left out one or two things. Would you please advise of that? Why do we end up with these cases in front of us? I understand. I'm not clear why a judge doesn't read the bench book and read Rule 11 when they advise. But doesn't your office have some obligation to prevent this error from occurring? It may not be reversible error, but it's clearly error. I think there is error, and I think the better practice would be for the prosecutor to say, by the way, there are certain things. It's somewhat uncomfortable, however, to try to point out to a district judge who's very experienced to say, you know what? What you've been doing all these years is wrong, judge. Let me point out. Well, I mean, you can always just say, hey, judge, you might want to, you know. It looks like you may have overlooked something. You might want to just. I mean, I have to agree, but. There's nothing wrong with that. I was, you know, for six years I sat in the district court in Los Angeles, and I have always asked prosecutors, did I overlook anything? And I agree that the better practice would be to do this. But even Rule 11 itself realizes there are so many things in Rule 11 that it has the harmless error standard built right in. Because there are just so many things. But in this case, the right to persist in a not guilty plea was in the plea agreement. The right to testify and present evidence, that was in substance, although it didn't say you. The plea agreement didn't say you can testify. It said you can present witnesses and evidence. So those things were contained in the plea agreement. But most importantly here, the defendant hasn't made any argument that he wouldn't, would he really not have pled guilty had any of these? I mean, the only one he even tries to make an argument about is restitution. And that, I just say, is patently ridiculous on its face, given that he waited until after the life sentence to raise it. At what point does failure to advise of the waived rights amount to structural error? Put aside Rule 11 error. At what point? He's arguing a structural error. I'm not sure I see it in this case. But is there a point at which it amounts to structural error? I don't think if looking at Rule 11 itself, I think it's Dominguez Benitez says at least a single one isn't even colorably structural. I think there is a constitutional issue as to what survives is whether a plea is knowing and voluntary. And in that sense, if you're totally left without telling someone the right to self-incrimination or the right to trial by jury or the right to confront your accusers, maybe which has happened in Boykin, if all of that just doesn't happen, then we can say in that sense it's not intelligent and voluntary. I think that survives. What doesn't survive is this whole history from McCarthy on, which I described in my brief of, you know, they said you didn't comply with the Supreme Court said you didn't comply with Rule 11. We're going to reverse. And all the appellate courts took a very stern view of that. There were a lot of reversals. And that's why we have the development in the law, why there was the harmless error. And then finally in Vaughn, the Supreme Court said it's plain error if they don't object. And that's what happened here. And I would just say that he hasn't met. It is his burden to show plain error. It's his burden to show how it would have affected his strategy, what he thought he could have gained by going to trial. He can't show that here. He confessed. There's just no point. Roberts. Okay. If there are no further questions, then. No, I have none. I don't have any. Mr. Burns. Counsel's comments about Dominguez. Dominguez footnote 6 says a single Rule 11 error can't be a structural error. Then footnote 10 says structural error, we don't do plain error review. And it's icebreaking as to what structural errors are. That's why I'm. Okay. So tell me why, because I don't understand your argument. What was the structural error here? There's a plea agreement that has a whole bunch of rights in it that he signs with counsel's advice. And then there's an advice that he had the right to trial by jury. He had the right to be represented by counsel. He had the right to cross-examine and confront witnesses. He had the right to subpoena witnesses. He had the right to remain silent. That means you don't have to take the stand or say anything, et cetera. And those are the ones the judge warned him about in the colloquy. What critical right was left out here that turns this into a structural error? There are two. One is shortly after Boykin was decided, the Supreme Court said that in advising someone about their right to, their Fifth Amendment right against self-incrimination, that the way to do that is to say, before they plead guilty, you have a right to persist in your not-guilty plea. The Supreme Court submits that proposed rule, addition to Rule 11, based on Boykin. Congress ratifies it and says, that's right, that should be given because Boykin requires it. So that's a Boykin structural error. And I'm not making up that these are structural errors. Collins, this Court's case in Collins, just in 2012, says, look, you know, Boykin sets out the three structural errors. The other one is the right to present evidence and to testify at trial. Again, in these submitted rules in 1974, the Supreme Court says, you know, Boykin indicates this is a primary, you know, important constitutional right, and will leave it to future development as to, you know, what flesh the district court should put on that, what they must put on it to satisfy the Constitution. But even if I look at Collins, I agree with you that there are certain Rule 11 errors that have been deemed fundamental. That's what Collins says. But in Diaz-Ramirez, we also said that these structural errors under Rule 11 are limited to those circumstances, and I quote, in which the record contains no evidence that the plea was voluntarily and intelligent. Now, I didn't even get any idea that you were arguing against that. The record here, I think, says that the plea was voluntarily and intelligent. So I'm still having trouble with whether these Rule 11 errors are structural. Because if I read Diaz-Ramirez, I have limited Collins. I think the thrust of Collins and the footnote in Dominguez and McCarthy and Boykin is if there are certain errors committed, there is no question as to whether or not there was prejudice. And the issue as to, well, what did the defendant know before, during, or after is an issue of prejudice. But to what extent is the plea agreement, you know? The plea agreement, is it presented to the court? Well, again, I think that that would be an issue of, well, did he previous to this time have some sort of understanding, whereas I think Boykin makes clear that that's the record. And I just can't remember exactly the column. Usually the judge asks, you know, did you sign this plea agreement? Did you read it? Did you discuss it with your lawyer? Did you ask? Is there anything you didn't understand about her? She didn't ask that. She did not say, and government counsel surely would have emphasized that in their briefing. She did not say, do you understand everything in the plea agreement? Did you discuss it with your lawyer? She does say, did you discuss it with your lawyer. So that's an issue. So how does all that factor into Judge Smith's concern here that nobody ever really argued that this wasn't a known and intelligent plea? And, well, again, I think that if it's structural error, none of that matters. Well, but that's not what D.S. says. Well, I think Collin says, the Court, well, and I'm paraphrasing, limited structural errors under Rule 11 are – there are errors under Rule 11 that are structural, but they're limited in which the record contains no evidence that the plea was voluntarily – voluntary and intelligent. Well, I can't find that. I don't even have you arguing it. Well, again, I would – I have a few answers to that. I would submit that Dominguez's Supreme Court indicates it's structural error, and so you don't ask those questions. And Gastelum, this Court's – this Court's opinion indicates that the question is, at the guilty plea is established that the person understood what was going on. But if we're going to look at Rule 11 error instead of just the Boykin error, amongst the Rule 11 error is that Judge Gonzales did not advise Mr. McGill that she had to consider departing from the guidelines. I believe that that is a critical failing in this case, because I'll tell you something. I and my co-counsel never dreamed that she would fail. You gave him an advance notice that she might vary up. No. Well, except the government, of course, asked for it. But when he was pleading guilty – What are you going to say? What are you going to say about the government's request for it? No, I'm not talking about notice before – I'm not talking about notice before the sentence. I'm talking about when he's going in to plead guilty and we're advising him. We never dreamed that she would do – Judge Gonzales would do what she did. We certainly didn't say to him, you know, you've got to be careful. This could be a life sentence. She could depart upward. We just didn't dream that was a possibility. We didn't – Counsel, let me – Counsel, I'm negotiating a guilty plea to what was an obvious second-degree murder. Judge Hurwitz has a question for you. Yeah. Let me ask you about the record, because I'm – you said something before, and I'm not sure it's correct. I'm looking at ER 213. The court says, Mr. McGill, I have in front of me this plea agreement. It's 12 pages. Your signature appears on the last page. Your initial needs are in the pages. Does this mean that you had the opportunity to go over this plea agreement with your attorneys? Mr. McGill says, yes, Your Honor. Do you feel I had enough time to talk to your attorneys about this? Yes, Your Honor. Were your attorneys able to answer any questions you had? Yes, Your Honor. So the record makes clear that the plea agreement was reviewed by Mr. McGill and his attorneys. And I think that's how I answered Judge Pius's question, that the record does indicate that the judge said, did you discuss this and have a chance to talk about the plea agreement with your attorney. It doesn't say, do you understand all the rights set out in the plea agreement. And you'll notice that later in the colloquy, she repeatedly asks when she goes over rights, maximum penalties, do you understand that? Do you understand that? Do you understand that? She does not do that with the constitutional rights. She doesn't say the rights she does go over. She doesn't say, do you understand these? And she doesn't say, do you understand all the rights set out in the plea agreement. She does not get that confirmation. And, again, I believe that that is structural error that is plain error review can't apply to. You do say there, let me ask you, Mr. Burns, you're standing there, Mr. Burns and Mr. Kahn, do you believe it's your client's best interest? Yes. Do you believe your client understands the consequences of his plea? Mr. Burns, I do. Do you have enough time to talk to your client about his case and any defenses? Yes. And you're satisfied that he's competent to go forward? Yes. So there is some questioning of you about whether there's any problems here, and you don't flag any. There's some question as to what? I'm sorry. Of you. Of yourself. The court asks you whether you went over the plea agreement, et cetera, et cetera, and you say yes, yes, yes. Well, the record, I mean, obviously, the record states what it states. I'm not going to argue with what's in black and white. My point is that she never says to him, do you understand, she never says, do you understand the rights that she went over, and she never understands, do you understand, she never says, do you understand the rights that are on the plea agreement. That is my crisp point. Not that she didn't ask about the plea agreement at all. Obviously, she did. Okay, Mr. Burns, we went way over time. Listen, do you have a question for you? No, no, I'm just looking at the record. I'm looking at 215. The court says if you give up that right, you give up all these rights, you're pretty guilty today, and I find you guilty because you tell me you're guilty. Do you understand that? Yes, Your Honor. Mr. O'Donnell says. At that point, I believe she was referring to one specific right. I believe she was referring to the beyond a reasonable doubt standard, if I recall correctly. Well, she also said all these rights. She said by pleading guilty, you give up these rights. I believe that's what she said. Not do you understand the rights set out in the plea agreement. You know, again, the record says what it says. We got it. We got your argument. Thank you for the generosity. Thank you, Mr. Burns. We appreciate your arguments. Counsel, have a safe trip back to San Diego. Matter is submitted.
judges: Paez, Smith, Hurwitz